

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-18-00375-CV

———————————————

JIN SONG, Appellant

V.

PAUL SUNG UH KANG, Appellee

On Appeal from the 48th District Court
Tarrant County, Texas
Trial Court No. 048-270933-14

Before Kerr, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

Jin Song sued Paul Sung Uh Kang for losses that Song incurred while Kang was managing Song's trading account. After a bench trial, the court rendered a take-nothing judgment. It did not file findings of fact and conclusions of law. Song appealed and raises three issues: (1) the trial court improperly withdrew Kang's deemed admissions; (2) the trial court was not impartial and openly expressed prejudice against Song and bias in Kang's favor; and (3) the trial court erred in rendering a take-nothing judgment because Song had proved his causes of action as a matter of law. We hold that Song did not preserve his first and second complaints and that his third complaint has no merit because the evidence legally and factually supports the take-nothing judgment. We affirm.

## Background

In early 2013, Song opened a $2 million TD Ameritrade[1] account with money that Song had complained to Kang was "sitting [there], doing nothing." He hired Kang to manage the account and gave Kang his user ID and password. Song and Kang had known each other for roughly 20 years and had done business together at least twice before. The email agreement by which Song hired Kang—setting Kang's

---

[1]"TD Ameritrade is a broker that offers an electronic trading platform for the trade of financial assets including common stocks, preferred stocks, futures contracts, exchange-traded funds, options, cryptocurrency, mutual funds, and fixed income investments. It also provide[s] margin lending[] and cash management services." https://en.wikipedia.org/wiki/TD_Ameritrade (last visited Apr. 6, 2020).

consulting fee at $20,000 for the first year and 10% of any profits—said nothing about Song's risk tolerance or objectives. But the day before Kang was authorized to start trading on Song's behalf, Kang asked him to adjust the account settings to enable trading on margin[2] so that Kang could engage in short selling,[3] which Kang called "half the game." Song agreed.

Fast-forward seven months, and Song's account had lost over $800,000. Concluding that the account was "not working," Song instructed Kang to close it.

A few months later, Song sued Kang for fraud, violations of the Texas Securities Act, breach of fiduciary duty, violations of the Texas Deceptive Trade Practices Act (DTPA), and negligence, all based on Kang's actions as Song's investment adviser. Song also pleaded alternative claims for negligent misrepresentation and breach of contract.

---

[2]Margin trading uses borrowed money to invest with and has "long been perceived to have special risks," including the risk of losing more funds than have been deposited in the margin account. 2 *Bromberg & Lowenfels on Securities Fraud* § 5:286 (2d ed.).

[3]Short selling involves investors who bet on stock-price declines, picking out "market losers"—securities that are expected to decline in the future because they are overvalued. *See generally* Kathryn F. Staley, *The Art of Short Selling* 4–5 (1997); Joseph A. Walker, *Selling Short: Risks, Rewards, and Strategies for Short Selling Stocks, Options, and Futures* 1–3 (1991). A short seller borrows a security from a broker and immediately sells it (selling short) at the current market price. *Id.* at 13–15. The short seller then waits for the anticipated market decline and "covers" by hopefully buying the security back at a lower price. *Id.* The short seller then returns the security to the broker and makes a profit on the buy-and-sell spread, minus any transaction and financing costs. *Id.* If the price goes up instead of down, the short seller may decide to cover at a loss. *Id.*

Initially, Song's case went well. In April 2015, Song won a summary judgment awarding him more than $800,000 in economic damages, over $1.6 million in treble damages under the DTPA, and some $730,000 in attorney's fees. But Kang appealed, and for reasons not relevant to our disposition of this appeal, we reversed the summary judgment and remanded the case to the trial court. *See Kang v. Song*, No. 02-15-00148-CV, 2016 WL 4903271, at *9 (Tex. App.—Fort Worth Sept. 15, 2016, no pet.) (mem. op.).

Back in the trial court, Song suffered more than just the setback of having his summary judgment reversed: after an August 2018 bench trial, the trial court ordered that Song take nothing against Kang.

Song now assumes the appellant's role, contending in three issues that

1. the trial court abused its discretion in sua sponte withdrawing Kang's deemed admissions;

2. the trial judge expressed prejudice against him and exhibited bias in Kang's favor; and

3. the trial court erred by rendering a take-nothing judgment because the evidence conclusively established fraud, negligence, and breach of fiduciary duty.

We affirm.

## I. Song did not preserve his deemed-admissions complaint.

In Song's first issue, he contends that the trial court abused its discretion in sua sponte withdrawing Kang's deemed admissions. Song argues that

- Kang filed his response to Song's request for admissions late,

4

- Song's requests were thus deemed admitted,

- Kang never filed a motion to withdraw the deemed admissions, and

- during trial, the court unilaterally withdrew Kang's deemed admissions.

*See* Tex. R. Civ. P. 198.2(c), 198.3; *Oliphant Fin., LLC v. Galaviz*, 299 S.W.3d 829, 838 (Tex. App.—Dallas 2009, no pet.). Song argues that the trial court's sua sponte act prejudiced him because he had counted on winning based on Kang's deemed admissions and thus was not prepared to prove up his case at trial without them.

## A. The trial court proceeded as if Kang's response was timely; Song did not object; and when Song belatedly objected, he did not procure an adverse ruling.

### 1. At an earlier hearing on Song's third sanctions motion, the trial court had put Song on notice that any admissions issues should be raised and would be resolved at trial.

We begin with Song's 15-page pretrial "Third Motion for Sanctions," which addressed—among many other things—Kang's late-filed response to Song's second request for admissions and which asserted that Song's requests were deemed admitted as a result. A flip to Song's prayer shows that he was seeking monetary relief, but elsewhere in his motion he also advocated for the death-penalty sanction. *See* Tex. R. Civ. P. 215.2(b), 215.4(b).

At the hearing, the trial court made clear that it would not rule until after it had reviewed Song's pleadings and that it would not entertain a death-penalty sanction with the trial less than a week away. (The trial ended up being pushed back another week.) During the hearing, the trial court noted that discovery-noncompliance

5

sanctions were self-operating and instructed Song's counsel to be vigilant at trial. For example, about Kang's failure to answer Song's document requests and interrogatories, the court said, "[Y]ou are going to have to be ever sharp on this, and when [Kang] starts to testify, you're going to have to have a request for production available and the interrogatory available and say, [']He's testifying about something that he did not respond to in discovery.[']" And about admissions, the court said, "[I]f [Kang] starts to testify on his case to something contrary to the deemed admission, . . . you [must] have an objection ready and say, [']He has already deemed this fact admitted. This testimony would be contrary to it.[']" In short, to the extent that Kang had failed to comply with discovery, the trial court expected Song to make the proper objection at trial.

**2.  Trial proceeded as if Kang's admissions responses had been timely.**

At trial, at the close of his opening statement, Song stated, "We also believe, as the Court has pointed out, that [Kang] has failed to timely respond to [Song's] discovery -- discovery requests. One of the chief ones are the request for admissions. They are attached to Plaintiff's third motion for sanctions . . . ." Here, Song noted a timeliness concern but did nothing more.

Immediately after making his opening statement, Song asked to admit his Plaintiff's Exhibits 1–29. Kang voiced no objection, and the trial court admitted them. Plaintiff's Exhibit 26 was Song's second request for admissions, and Plaintiff's Exhibit 28 was Kang's tardy response to that request.

6

Kang then proceeded to give his opening statement. Almost immediately the trial court asked Kang where his responses to Song's request for admissions were, and Kang directed the court to the exhibits that the trial court had just admitted. The trial court acknowledged finding them: "Thank you. I have got it. All right. You may proceed with your opening statement." Song said nothing at that point about disregarding Kang's untimely responses.

After Kang finished his opening statement, Kang and the trial court engaged in the following dialogue:

> THE COURT: . . . . You [Kang] haven't responded -- you know, if it's shown you haven't responded to discovery, you're going to have some problems. If it's shown you have not filed the proper answer, you have problems.
>
> Now, I just want you to know that the fact that you tell me this in opening statement, if you haven't complied with the rules, I cannot consider it. Do you understand that?
>
> [Kang]: I appreciate that and hope that you will give me an opportunity to provide some evidence and some testimony through the trial.
>
> THE COURT: Well, you can't give the testimony if you haven't properly responded to discovery. That's the issue.
>
> [Kang]: *I have provided responses to admissions, and it is in their exhibits.*
>
> THE COURT: The admissions but not the request for production and interrogatories is what I'm told. [Emphasis added.]

Once again, Kang directed the court to his response to Song's request for admissions. Significantly, the trial court's comment suggested that it was limiting any discovery issues only to Song's document requests and interrogatories. Again Song said nothing.

7

Immediately after the opening statements, the trial court announced that it was going to "deal with the admissions while we're at it at this point." Song remained mute.

The trial court proceeded to the merits of Kang's objections to Song's admissions requests, overruled them, and ruled that Kang had denied all of Song's admissions requests except requests 6, 8, and 46:

> THE COURT: . . . . I have reviewed the request for admissions, and the objections are overruled. However, with the -- without exception, each of the admissions of Mr. Kang in this matter, save and except one -- 6 -- Number 6, Number 8, Number 46 are -- with the exception of 6, 8, and 46, all begin with the word "deny," then they have an explanation after that.
>
> I feel that those admissions, which would be 1 through 45, save and except 6 and 8, that when you say "deny," you have denied the admission, thereby placing the burden on the proponent to make the burden of proof that the answers meet the requirements of the rule.

Thus, the trial court ruled that Kang had admitted only the following:

- he had Series 7 and Series 66 licenses when he began managing Song's trading account (request 6),

- he told Song that Kang was a founder and manager of AltaCap Corporation (request 8), and

- he disclosed all material facts to Song about how Kang invested Song's money in the trading account (request 46).[4]

---

[4]The trial court elaborated on request 46, noting that it was "deemed admitted because it does not contain a statement of either admits or denies." Kang had actually admitted requests 6 and 8.

8

Although these few admissions did nothing to advance Song's case, Song stood silent throughout the court's explanation of its ruling.

> The trial court then addressed Song's counsel:
>
> [Kang] has -- he has given a full denial and then offered additional information on the ones I have said he denied properly. So you know where you are on the trial, you need to make that prove up.
>
> Now, call your first witness on [Song's] side of the case.
>
> [Song's counsel]: May [I] make one argument towards the admission?
>
> THE COURT: No. I think I have ruled.
>
> [Song's counsel]: Yes, Your Honor.
>
> THE COURT: You have your -- you have your error.

Here, Song might have intended to raise his timeliness objection and urge that all his requests had been deemed admitted, but we do not know because he never articulated his complaint. From the context, the trial court appeared to have assumed that Song wanted to challenge the court's rulings about which requests were admitted and which were not, and Song said nothing to disabuse the court of that notion.

> Song then waited until his closing argument to object to the timeliness of Kang's responses to Song's request for admissions:
>
> Respectfully, [I] would like to point out that [Kang] -- well, respectfully, [I] would object to the Court's ruling with respect to [Kang's] response to admissions. I think the Court can take judicial notice of the third motion to compel and show that [Kang] had late-filed his response or late served the response.

9

Song proceeded with a few other remarks before ending his closing statement, and the trial court responded only with, "All right. Mr. Kang." The trial court made no ruling on Song's objection, nor did Song ask for one.

**B. Because of a missing page in Song's exhibit, the trial court failed to address Song's requests 47 through 53, but Song never brought that to the court's attention.**

In addition to the admission responses' timeliness issue, one other glitch—at least on appeal—surfaced. Song had served 53 requests for admission, and Kang answered all 53, though late. But the copy of Kang's response that Song admitted into evidence omitted the last page, on which Kang denied Song's requests 47–53. Because the trial court was going off the copy that Song had provided as an exhibit, the court neither addressed nor ruled on Kang's denials to requests 47–53. On appeal, Song argues that these requests should be deemed admitted.

But at trial, Song did not bring this argument to the court's attention. And although Song filed a 34-page motion for new trial and although Song noted there that the trial court's rulings went only through request 46, he did not mention this new contention—that requests 47–53 should be deemed admitted—in his new-trial motion either. To the contrary in fact, Song's motion asserted (at least implicitly) that the trial court had addressed all 53: "Here, Plaintiff [sic] deemed fifty-three (53) admissions and the Court *sua sponte* undeemed all but three (3) admissions."

10

**C. Song did not timely object or obtain an adverse ruling.**

After reviewing the record, we hold that Song failed to preserve these complaints for appeal. *See* Tex. R. App. P. 33.1(a)(1), (2). Song waited until his closing argument to object to the trial court's considering Kang's untimely response and, even then, failed to elicit an adverse ruling. And Song never presented his contention about requests 47–53 to the trial court at all. A timely objection and an adverse ruling are prerequisites to preserving error. *Id.* "Requiring parties to raise complaints at trial conserves judicial resources by giving trial courts an opportunity to correct an error before an appeal proceeds." *In re B.L.D.*, 113 S.W.3d 340, 350 (Tex. 2003). Fairness between the litigants is also a consideration: a party should not be allowed to waive, consent to, or neglect to complain about an error at trial and then surprise his opponent on appeal by stating a complaint for the first time. *Id.* Having made no timely objection and having obtained no adverse ruling, Song failed to preserve his arguments. *See* Tex. R. App. P. 33.1(a)(1), (2).

We overrule Song's first issue.

## II. Song did not preserve his judicial-bias and -prejudice complaints, which lack merit in any event.

In Song's second issue, he argues that the trial court expressed prejudice against him and showed bias in Kang's favor. Song, who was represented by counsel, contends that the trial court favored Kang, who appeared pro se, to Song's prejudice.

11

## A. Examples of what Song claims was judicial bias and prejudice.

For example, when Song wanted to call Kang as a witness, Song contends that the trial court persuaded him not to. In context, when the trial court learned that Song and Kang had not signed any written engagement agreement, Song's counsel asserted that he was relying on Song's and Kang's emails, Song's testimony, and perhaps Kang's testimony. Given Song's previous complaints about Kang's not responding to Song's discovery, the trial court warned Song's counsel that any advantage Song might have gained by keeping Kang off the stand might be lost by calling Kang as a witness. The trial court said, "It's a close call. I mean, there are different situations. There are close calls. But once you call for an answer that's been asked in discovery but not responded to[,] on the [stand], the witness is entitled to answer. That's my read." As we noted earlier, the trial judge had discussed this same issue at the sanctions hearing. Song ultimately did not call Kang as a witness.

Another example of alleged bias in Kang's favor came after Song had rested and Kang indicated that he wanted to testify. But before Kang took the stand, the trial court expressed concern that if Kang did so, he might expose himself to criminal prosecution:

> THE COURT: Is it your testimony that when you don't have your license parked with a brokerage house, you can act as a securit[ies] advisor without violation of the law?
>
> [Kang]: I have to admit, I don't believe that I was serving as a securities advisor.

THE COURT: You don't believe you were serving as a securit[ies] advisor when you advise people to hold a position longer because [the market] would turn up? I mean, how does that -- let me just tell you something, I'm unclear as to whether or not to read you your rights.

[Kang]: Uh-huh.

THE COURT: Because I believe that if you violate those laws, don't you have certain criminal exposure?

[Kang]: I have to admit, I don't know that, sir.

. . . .

[THE COURT]: You can only do what your license permits you to do. I have now sworn you in. Any testimony you give now voluntarily, I want you to be -- take a few minutes and decide whether or not you -- I want to give you an opportunity to defend the case as much as you can, but I also don't want you to be in a situation where you think I -- that I'm requiring you to testify or I'm compelling you to testify.

They have rested without calling you. And so, quite frankly, I'm not in a position of having to worry about it as a result of their questions.

But I am a little bit concerned -- maybe I shouldn't be. You're the only one that can really tell me. I'm not certain -- I'm not certain it is -- I'm not sure if it is criminal activity or not if you act as a securit[ies] advisor in violation of [Financial Industry Regulatory Authority] regs or when you are not parked. I just want you to think about whether you have any concerns about testifying.

After a break, Kang opted not to testify.

Next, Song complains that the trial court openly expressed disbelief that Song

was an "unsophisticated" person, through such comments as these:

There is enough evidence to show me that this is not an unsophisticated person who has these funds in the Ameritrade account, that self-directed account, and that at least during the periods that the emails are relevant

13

to, it was an account in which the -- Mr. Song was active and writing emails inquiring about should we do this or should we not do this.

Along the same lines, the trial court instructed Song's counsel to "[s]top asking these questions that beg credibility."

But the record shows that the trial court had reason to question Song's purported lack of sophistication. In addition to the emails that the trial court referred to, Song had earlier testified that he ran two companies, each with $50 million in revenues.

Song also complains about sharp remarks that the trial court directed at Song's counsel. For example, the trial court criticized Song's counsel's continuously using leading questions during Song's testimony: "[Y]ou're leading this witness around like it's a little trick pony inside of a pen, asking him questions that are based on some sort of guideline on what you must prove in a financial advisement case." Later, before Song's counsel began his redirect, the trial court admonished him:

There won't be a single leading question permitted.

[Song's counsel]: I'll --

THE COURT: So think about that before you get into it.

[Song's counsel]: Yes, Your Honor.

. . . .

THE COURT: Why don't you tell me what you want him to say and then see if -- because that's what you're doing. That's not the way you do a nonleading question.

14

But can I -- can I explain something to you?

[Song's counsel]: Yes, Your Honor.

THE COURT: I have two very accomplished business people on the stand, business people with accomplishments far surpassing my individual accomplishments in business or in trading, okay, and I suspect far exceeding any of [counsel's] abilities at the table, men who are accomplished and have done business together previously, men who obviously understand agreements, and people who are obviously not children or sophomoric juveniles.

If, as a lawyer, you ask a witness a leading question and he is your witness, the listener presumes that the witness would either testify differently or would not testify at all in that fashion.

At another point, the trial court became testy with counsel when, after the court shut down Kang's attempt to raise a (long-since-waived) personal-jurisdiction issue, Song's counsel launched into questions designed to establish personal jurisdiction.[5] Then, while the trial court was questioning why Song's counsel was pursuing an issue that the court had already decided in Song's favor, counsel's cell phone began ringing, which did little to calm the waters:

[Song's counsel]: I'm sorry, Your Honor?

THE COURT: You just don't -- listen, I just told you it didn't make any difference because there was no special appearance.

[Song's counsel]: Yes, Your Honor.

---

[5]In Kang's pro se brief, he persists in questioning how Texas acquired personal jurisdiction over him, a New Yorker. *See generally* Tex. R. Civ. P. 120a; *Nationwide Distrib, Servs., Inc. v. Jones*, 496 S.W.3d 221, 224 (Tex. App.—Houston [1st Dist.] 2016, no pet.).

THE COURT: What do you think my time is worth?

[Song's counsel]: A great deal, Your Honor.

(Phone interruption.)

THE COURT: Well, then, you are not respecting it very well when I tell you it's not relevant and there is no special appearance.

[Song's counsel]: Yes, Your Honor.

(Phone interruption.)

THE COURT: Just a second. What?

THE REPORTER: Could we stop for a moment for them to find the phone that's going off over here, please?

THE COURT: Why? It's just a circus out here.

[Song's counsel]: Sorry, Your Honor. It was on silent. Didn't know it would get picked up.

(Brief pause in proceedings.)

## B. Parties are entitled to a fair and impartial judge.

All parties have a right to a fair trial before an impartial judge. *Ellason v. Ellason*, 162 S.W.3d 883, 887 (Tex. App.—Dallas 2005, no pet.). A neutral and detached judge is fundamental to a fair trial. *Markowitz v. Markowitz*, 118 S.W.3d 82, 86 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (op. on reh'g). Judges should not advocate for any party. *Rymer v. Lewis*, 206 S.W.3d 732, 736 (Tex. App.—Dallas 2006, no pet.); *Markowitz*, 118 S.W.3d at 86. Impartiality ensures that the court's fairness and integrity are neither doubted nor questioned. *Rymer*, 206 S.W.3d at 736. Decisions rendered

under circumstances that suggest bias, prejudice, or favoritism undermine the judiciary's integrity, breed skepticism and mistrust, and mar the judicial system's basic principles. *Hoggett v. Brown*, 971 S.W.2d 472, 495 (Tex. App.—Houston [14th Dist.] 1997, pet. denied).

Only in the rarest of circumstances will judicial rulings show favoritism or antagonism to the degree necessary to conclude that the trial was not fair or that the judge was not impartial. *Ellason*, 162 S.W.3d at 887; *see also Haynes v. Union Pac. R.R. Co.*, No. 01-18-00181-CV, 2020 WL 425130, at *11 (Tex. App.—Houston [1st Dist.] Jan. 28, 2020, pet. filed). Appellate grounds are the best way to attack adverse rulings; using adverse rulings as evidence of judicial bias is a harder sale. *See Haynes*, 2020 WL 425130, at *11, *Ellason*, 162 S.W.3d at 887.

When presented with allegations of judicial bias, the United States Supreme Court has written that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion" and that the opinions a judge forms during a trial do not call into question a judge's bias or partiality "unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555, 114 S. Ct. 1147, 1157 (1994). Critical, disapproving, or even hostile judicial remarks during trial to counsel, the parties, or their cases do not ordinarily support a bias or partiality challenge. *Id.*, 114 S. Ct. at 1157. Further, "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even . . . judges, sometimes display" do not establish

bias or partiality. *Id.* at 555–56, 114 S. Ct. at 1157. "A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." *Id.* at 556, 114 S. Ct. at 1157.

In the same vein, a trial court has the inherent power to act to economize the "time and effort for itself, for counsel, and for litigants." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 240 (Tex. 2001) (per curiam) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254, 57 S. Ct. 163, 166 (1936)). In conducting a trial, the court may properly intervene to

- make the procedures effective for determining the truth,

- avoid wasting time,

- protect a witness from harassment or undue embarrassment, and

- discourage leading questions on direct examination, except as necessary to develop a witness's testimony.

*See* Tex. R. Evid. 611(a), (c); *Dow Chem. Co.*, 46 S.W.3d at 240–41; *Great Glob. Assurance Co. v. Keltex Props., Inc.*, 904 S.W.2d 771, 777 (Tex. App.—Corpus Christi 1995, no writ); *Metzger v. Sebek*, 892 S.W.2d 20, 38 (Tex. App.—Houston [1st Dist.] 1994, writ denied). As part of that discretion, a trial court can express itself. *Dow Chem. Co.*, 46 S.W.3d at 240–41.

Finally, as with many other alleged errors, to preserve a complaint that the trial court abused its discretion, a party generally must object to the trial court's alleged

18

improper conduct or comment when it occurs. *See Dow Chem. Co.*, 46 S.W.3d at 241; *Markowitz*, 118 S.W.3d at 88; *see also Haynes*, 2020 WL 425130, at *9.

### C. Song did not complain at trial, and even if he had, we are not persuaded.

Song never objected at trial to any of the matters he raises in his second issue. A party must object to a trial court's allegedly improper conduct or comment when it occurs to preserve error for appellate review, unless the conduct or comment cannot be rendered harmless by a proper instruction. *See Dow Chem. Co.*, 46 S.W.3d at 241. In the context of a bench trial, if the error is incurable, courts excuse a party's failure to preserve error. *See In re L.S.*, No. 02-17-00132-CV, 2017 WL 4172584, at *16 (Tex. App.—Fort Worth Sept. 21, 2017, no pet.) (mem. op.). This exception essentially requires a harm analysis—whether the error probably caused the rendition of an improper judgment—to determine whether the error was incurable and, thus, not subject to waiver. *See id.* For two reasons, we hold that there was no error to cure, so Song waived any complaint by not objecting at trial.

First, the record shows that the trial court alerted both parties when red flags appeared but left it to the parties to determine how to proceed. The record does not show that the trial judge in effect represented Kang while simultaneously acting as the judge in Song's and Kang's dispute. *See Markowitz*, 118 S.W.3d at 88. *Cf. L.S.*, 2017 WL 4172584, at *17 ("[T]he trial judge badgered DFPS into seeking termination [after DFPS had stated that it had no grounds to do so] because the judge, who was sitting as the fact-finder, had already determined that Father was noncompliant and

19

would never be compliant . . . ."), *19 ("[The trial judge's] questioning [Father extensively] shows that the trial judge had ceased to be an impartial fact-finder or umpire and was acting as an advocate in favor of termination.").

Second, although we can agree that the trial court expressed some impatience, dissatisfaction, annoyance, and perhaps even anger, the record falls short of demonstrating bias or partiality. *See Liteky*, 510 U.S. at 555–56, 114 S. Ct. at 1157. "Impartiality is not gullibility." *Id.* at 551, 114 S. Ct. at 1155 (quoting *In re J.P. Linahan, Inc.*, 138 F.2d 650, 654 (2nd Cir. 1943)[6]). The record shows that the court was trying to determine the truth, to avoid wasting time, to protect Kang from perhaps

---

[6]In *J.P. Linahan*, Judge Jerome Frank elaborated that the trial court, as the factfinder, evaluates not only the witnesses but also the lawyers:

> The judge's decision turns, often, on what he believes to be the facts of the case. As a fact-finder, he is himself a witness—a witness of the witnesses; he should, therefore, learn to avoid the errors which, because of prejudice, often affect those witnesses.
>
> But, just because his fact-finding is based on his estimates of the witnesses, of their reliability as reporters of what they saw and heard, it is his duty, while listening to and watching them, to form attitudes towards them. He must do his best to ascertain their motives, their biases, their dominating passions and interests, for only so can he judge of the accuracy of their narrations. He must also shrewdly observe the strat[a]gems of the opposing lawyers, perceive their efforts to sway him by appeals to his predilections. He must cannily penetrate through the surface of their remarks to their real purposes and motives. He has an official obligation to become prejudiced in that sense. Impartiality is not gullibility.

*Id.* at 653–54 (footnotes omitted).

unknowingly incriminating himself, and to curb Song's counsel's leading questions. *See* Tex. R. Evid. 611(a), (c).

Because Song has not preserved his complaint and, even if he had, he has not shown judicial bias or prejudice, we overrule Song's second issue.

## III. Song's sufficiency complaints fail.

In Song's third and final issue, he contends that the trial court erred by rendering a take-nothing judgment because the evidence conclusively established Kang's fraud, negligence, and breach of fiduciary duty. We disagree.

### A. Standards of review.

Although Song timely requested findings of fact and conclusions of law, after the trial court did not sign any, Song filed an untimely notice of past-due findings of fact and conclusions of law.[7] *See* Tex. R. Civ. P. 296, 297. When a party files a timely request but does not file a timely past-due notice, "it is as if no initial request was made." *In re A.I.G.*, 135 S.W.3d 687, 694 (Tex. App.—San Antonio 2003, no pet.). When, as here, a trial court does not issue findings of fact or conclusions of law after a bench trial, we imply all relevant facts necessary to support the judgment that are

---

[7]The trial court signed its judgment on August 27. Song's request was thus due by September 16 and was timely filed on September 4. *See* Tex. R. Civ. P. 296. The trial court's findings and conclusions were due September 24, and Song's past-due notice was due October 4. *See* Tex. R. Civ. P. 297. Song filed his past-due notice (and amended notice) more than a month later on November 8.

21

supported by the evidence. *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013).

Song does not dispute that, as the plaintiff, he bore the burden of proof at trial. Parties attacking the legal sufficiency of an adverse finding on an issue on which they have the burden of proof must show on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue.[8] *Dow Chem. Co.*, 46 S.W.3d at 241. In reviewing such a matter-of-law challenge, we examine the record for evidence supporting the finding (or implied finding) and ignore all contrary evidence. *Id.* If no evidence supports the finding, we then examine the entire record to determine if it establishes the contrary proposition as a matter of law. *Id.* Only if the record establishes the contrary position as a matter of law should we sustain the point. *Id.*

Attacking the factual sufficiency of an adverse finding (or implied finding) on an issue on which the party had the evidentiary burden at trial requires showing on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Id.* at 242. We consider and weigh all the evidence and set aside a judgment only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *See id.*

---

[8]Song's brief lays out only the factual-sufficiency standard, but because he argues that the evidence "conclusively" established his fraud, negligence, and fiduciary-breach claims, we will review the evidence for both legal and factual sufficiency.

## B. Song did not prove his case.

During Song's testimony, the trial court challenged Song's counsel about how Song could prove his case without an expert:

> THE COURT: . . . [Song] is not qualified as an expert. There is no expert testimony yet that the trades were inappropriate or improperly researched. And it's not a matter of being able to reach that conclusion.
>
> And, finally, if you take it to its logical sense, you would have to show that it had been properly researched by a reasonably prudent advisor with -- knowing the risk tolerance of the client would not have made that investment.
>
> You don't have an expert, do you?
>
> [Song's counsel]: Your Honor, I --
>
> THE COURT: Do you have an expert witness on the trades in question who has examined the trades and made that determination? That's a "yes" or "no" question.
>
> [Song's counsel]: No, Your Honor.
>
> THE COURT: Okay. So let me just be frank with you. Are you -- are you on the theory that Mr. Kang was an insurer of the results that were to be obtained and that he agreed and -- it is like a guarantor, that there was no -- no risk there?
>
> And are you going to introduce testimony on specific trades that were inappropriate?
>
> [Song's counsel]: Our theory is that Mr. Kang did guarantee, through an agreement with [Song], that no loss would occur to the principal.

When Kang cross-examined Song, Kang not only showed that Song could not trace the trades specifically to Kang (although to Song's thinking, no one but Kang

23

could have made the trades) but also underscored Song's lacking the expertise to judge whether Kang had acted negligently or breached any fiduciary duty:

Q. [Kang to Song] Okay. So you do understand that during that period of time, you had six monthly reports plus you could look at the account every hour if you wanted to?

A. Yes, I do.

Q. You had the ability, right?

A. Yes.

Q. All right. And -- and have you gone through the statements at this point?

A. Yes.

Q. You have? And you've gone line by line and said these are the trades that [Kang] made?

A. All of 'em on the account is [Kang] made.

Q. How do you know that?

A. Because I didn't trade it. You the only one trade it.

Q. Could have been, I don't know, your broker at TD Ameritrade, right?

A. Could be, but I don't think so.

Q. Okay.

A. Anything is possible, but I don't think any of TD Ameritrade persons touch that account.

Q. So -- but you don't actually know that -- that I made every trade on that report?

A. Yes.

24

Q. Okay. So in addition to that, do you know where you lost money, which trades you lost money?

A. Not exactly. It was too confusing. There is so many trade. In particular -- I mean, every month there is so many trade going on. I couldn't even follow up, and I don't know how to read that report correctly.

Q. So you don't actually know that -- how your losses were made?

A. I don't know how you lost that money.

Q. Right. Okay. But, I mean, do you know?

A. I'm sorry?

Q. Do you know which trades lost you money?

A. No.

Q. You don't? Okay. And with -- you know, your lawyer talked about short trading a lot.

What do you know about short trading?

A. Basically, almost nothing.

Q. Okay. So short trade -- you make money on short trades if the market goes down and, of course, with the long trades, you make money when the market goes up, and so you kind of, what they call, hit yourself depending on where the market goes.

Doesn't it seem like a less risky way to invest rather than a more risky way to invest?

A. I don't know anything about the trade, honestly, whether short margins, hedging, and all kind of stuff all the time, but I don't have any concepts of what it is and how to do it.[9]

---

[9]Certain of Song's exhibits suggested that Song did understand margin trading and short selling. For example, Song recognizing in an April 2013 email that the

Q. So, as you have mentioned before, you are not an expert in terms of whether I was taking too much risk or too little risk?

A. Yes. I'm not.

Q. You are not an expert. All right. Thank you.

## C. Song testified, but Kang did not.

Song notes that only he presented evidence at trial and argues that because Kang presented nothing to disprove his case, Song's evidence was uncontested.

But "[u]ncontroverted evidence . . . is not necessarily conclusive evidence." *U.S. KingKing, LLC v. Precision Energy Servs.*, 555 S.W.3d 200, 215 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005)). Generally, even if uncontroverted, an interested witness's testimony does no more than raise a fact issue that the factfinder resolves. *See Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990) (per curium). The exception: when the interested witness's testimony is

- not contradicted by any other witness or attendant circumstances;

- clear, direct, and positive; and

- free from contradiction, inaccuracies, and circumstances tending to make it suspect.

---

account had suffered a $200,000 loss, asked Kang, "Do we need to continue playing it? We can make more money with my strategy; simple and stupid." In July 2013, showing a grasp of short-selling's strategy, Song emailed Kang, "Hey I am watching today['s] market. [H]ow much [does the] market [have] to [go] down for us to be positive?"

*Id.* If the interested witness's testimony meets this exception, it is taken as true as a matter of law, especially when the opponent has the means and opportunity to disprove the testimony and fails to do so. *Id.* (quoting *Anchor Cas. Co. v. Bowers*, 393 S.W.2d 168, 169 (Tex. 1965)); *see Smith v. Patrick W.Y. Tam Trust*, 296 S.W.3d 545, 547 (Tex. 2009). The failure to contradict is a factor that courts consider, but when the circumstances tend to discredit or impeach the interested witness's testimony, the failure does not necessarily preclude concluding that a fact issue exists. *Anchor Cas. Co.*, 393 S.W.2d at 170. Even when evidence is uncontradicted, if it is unreasonable, incredible, or its belief is questionable, then such evidence would raise a fact issue for the factfinder's determination. *Ragsdale*, 801 S.W.2d at 882.

## D. Song has not shown that the trial court's implied findings are legally or factually insufficient.

Nothing in the parties' emails showed that Kang guaranteed he would make good any losses Song sustained or would prevent losses in the first place. And although Song testified that was precisely what Kang did, the trial court did not have to believe Song. *Cf. Smith*, 296 S.W.3d at 548 ("The court of appeals held that fees were established as a matter of law. But the fee, though supported by uncontradicted testimony, was unreasonable in light of the amount involved and the results obtained . . . ." (citation omitted)); *Escobar v. Harris County*, 442 S.W.3d 621, 637 (Tex. App.—Houston [1st Dist.] 2014, no pet.) ("Deputy Goodney . . . was the sole source of evidence that Luis appeared to reach for a weapon. . . . [B]ased upon this record, . . .

27

Deputy Goodney's testimony that Luis appeared to reach for a weapon did not conclusively establish [what happened] but instead raised 'an issue of credibility [for the jury].'" (citation omitted)).

Along with the trial court's inherent credibility determinations in Kang's favor, other evidence undercut Song's assertion that the account was to have been risk-free. For example, in an April 2013 email exchange between Song and Kang, Song lamented that the account had already lost $200,000. But Song did not express dismay or confusion over how a purportedly risk-free account had incurred any losses, much less $200,000 in losses, and instead suggested a different strategy. And despite the sizeable losses in April, Song waited until September to ask Kang to close the account.

Investing in the stock market is not risk-free. *See* Roger W. Reinsch, J. Bradley Reich, Nauzer Balsara, *Trust Your Broker?: Suitability, Modern Portfolio Theory, and Expert Witnesses*, 17 St. Thomas L. Rev. 173, 177 n.26 (2004); Ken Little, *The Major Types of Risks for Stock Investors*, The Balance (Feb. 4, 2020), https://www.the balance.com/major-types-of-risk-for-stock-investors-3141315 (last visited Ap. 7, 2020). Asserting that Song believed otherwise strains credulity. Equally noncredible is Song's assertion that Kang represented otherwise and that Song believed him.

As the factfinder, the trial court could have reasonably concluded that Song's conduct was not that of someone whose overriding concern was conserving his principal and, given the nature of Song's account, the trial court could have reasonably disbelieved Song's assertion that he thought he was engaging in a risk-free enterprise.

The initiating email showed that Song gave Kang permission to run his account without any articulated limitations or identifiable objectives. And without an expert, Song had no means to show that Kang had defrauded him, acted negligently, or breached any fiduciary duty. *See Kang*, 2016 WL 4903271, at *7 ("[Kang] owed a fiduciary duty to Song. However, what a fiduciary duty requires of the fiduciary can vary." (footnote omitted)).

Because the evidence supported the trial court's implied findings, it follows that Song did not establish fraud, negligence, or a breach of fiduciary duty as a matter of law. *See Dow Chem. Co.*, 46 S.W.3d at 241. Nor were the adverse findings against the great weight and preponderance of the evidence. *See id.* at 242. We hold that the evidence is both legally and factually sufficient to support the trial court's judgment.

We overrule Song's third issue.

## Conclusion

Having overruled Song's three issues, we affirm the trial court's take-nothing judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: April 9, 2020

29